**UNITED STATES of America,**
**Appellee,**

v.

**Albert GRUNBERGER, Appellant.**

**No. 218, Docket 33675.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 9, 1969.

Decided Sept. 14, 1970.

Anthony J. DiPaola, Asst. U. S. Atty., Vincent T. McCarthy, U. S. Atty., for appellee.

H. Richard Uviller, New York City, for appellant.

**1064**

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

WATERMAN, Circuit Judge:

Appellant Albert Grunberger appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York convicting him after a jury trial. He was convicted on three counts of having concealed, sold, and facilitated the transportation of illegally imported Swiss watch movements in violation of 18 U.S.C. § 545 [1] and on one count of conspiracy to do so. Grunberger was tried on a six-count indictment. One count was dismissed by the trial court and the jury returned a not guilty verdict on another. He was sentenced to serve concurrent terms of imprisonment for a year and a day and to pay cumulative fines of $10,000 on two counts; on the remaining two counts he was given a suspended sentence and a two-year period of probation to commence after termination of the prison term.

Appellant urges that his conviction should be reversed on the grounds that (1) the evidence was insufficient to support a verdict of guilty; (2) he was unfairly prejudiced while on the witness stand by an excessive and improper examination of him by the trial judge; (3) the prosecutor while addressing the jury alluded to matters extraneous to the record by expressing his personal belief in defendant's guilt; and (4) the court improperly instructed the jury concerning an alleged admission. We find that the cumulative effect of errors committed at trial when viewed in the light of the trial posture of the case as a whole requires a reversal and a remand.

The United States Customs Bureau had for some time kept defendant, a German-born citizen seeking to immigrate to the United States, under surveillance. In their effort to implicate Grunberger as a dealer in smuggled goods the Customs Bureau officials acquired the cooperation of one Kalman Berger, who at the time his cooperation was secured was under indictment for possession of smuggled watch movements.[2] At Grunberger's trial Kalman Berger testified that he had come to this country from Hungary approximately 15 years prior to the trial and had continually been in the "watch importing business" during that period. According to Berger, he met with defendant on June 28, 1967, and arranged to buy Swiss watches and movements. On July 19, the defendant and Berger met at a restaurant in Brooklyn to consummate the deal. Berger there wrote the defendant a post-dated check for $12,000 with the name "Simeon" entered thereon as payee upon the understanding that he would receive 2500 assorted movements. After transferring only 2000 movements to Berger's rented car in a nearby parking lot, Grunberger told Berger that he would later deliver the balance of 500 movements, and gave him a key to a subway locker in which Berger was assured he would find some liquor. Berger, having taken leave of defendant, then met with a Customs agent to hand over what turned out to be 2000 "unsymboled" [3] Swiss watch movements.

---

1. § 545. Smuggling goods into the United States

    *       *       *       *       *

    Whoever fraudulently or knowingly * * * conceals, * * * sells, or in any manner facilitates the transportation, concealment, or sale of such [illegally imported] merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

    Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. Prior to Grunberger's trial Berger had pleaded guilty to possession of smuggled watch movements and had been sentenced to pay a $5,000 fine and to three years probation.

3. A 1936 agreement between the United States and Switzerland provides that Swiss watch movements imported into this country must be stamped with a mark or "symbol" to distinguish each United States importer.

On Berger's way home he picked up a bag from the designated subway locker represented by defendant to contain liquor. After traveling some time en route home Berger unexpectedly discovered the bag contained 1000 unsymboled Swiss movements. These were later, according to Berger, also turned over to Customs officials.

Grunberger's version of the transaction varied from Berger's version in several major respects: He recounted that Berger had at one time purchased $50,-000.00 worth of whisky futures from him as a broker, which, as it turned out, was a losing investment for Berger. Berger had subsequently pledged these whisky certificates as collateral for a loan of $12,000 Berger obtained from Jechiel Herstig, a watchmaker who did business with Berger.[4] At about this time Berger delivered to Herstig 2000 watch movements to have the name "Leica" on the watch dials removed and the name "Cova" substituted. Berger had testified in cross-examination that he employed the trade name "Leica," among others, on watches imported in his business. Disturbed by the declining value of his security, Herstig demanded payment of the loan. Berger, unable to pay, became embittered when Herstig consequently refused to return his watches. Grunberger was prevailed upon to mediate the dispute and, so acting, persuaded Herstig to cancel the interest due on the loan, to settle the obligation by accepting repayment of the principal only, and to return Berger's watches. Grunberger accordingly conducted the exchange of the 2000 watch movements and the whisky certificates for a $12,000 check. The check was then turned over to Herstig, who had designated that the name of the payee was to be "Simeon." Finally, Grunberger denied all knowledge of the watches Berger stated Berger had found in the subway locker instead of liquor.

Expert testimony and documentary evidence offered by the prosecution established that the allegedly smuggled watches Grunberger was charged with having sold to Berger for $12,000 were Swiss made and bore no symbols, that no record of the legal importation of watches marked "Cova" (the name appearing on the unsymboled movements in question) could be found among the records of legally imported unsymboled Swiss movements, and that there was no record of importation of any watches in the names of either Grunberger or Herstig.[5] Thus, proof that the watches were illegally imported was only circumstantial, but, of course, if no record could be found showing that the watches were legally imported, the jury could infer that they were illegally imported.

The evidence also indicated, however, that unsymboled Swiss movements may be lawfully introduced into U. S. domestic commerce as a result of government sales after forfeitures, and, also, that, under certain circumstances, unsymboled Swiss watches may be legally imported from abroad. Expert testimony by a government witness also established that the identifying names on a watch dial, e. g., "Cova," may be removed and any name printed in its place. Indeed, the Government's expert witness indicated this practice was common in the trade and Berger testified it was his regular practice to have the trade names on dials of watches he imported changed by a chemical and stenciling process.[6]

---

4. Jechiel Herstig, who had not been apprehended at the time Grunberger was tried, was named in the six-count indictment as a co-conspirator and codefendant.

5. In addition to the 1936 Swiss trade agreement requiring imported Swiss watches to be symboled, see note 3, *supra*, a directive from the Commissioner of Customs requires all Customs Collectors to furnish particulars to the Swiss Consul General in New York when Swiss watch movements are imported that do not have distinguishing symbols stamped on them.

6. The second batch of 1000 watch movements Berger testified he picked up in the subway locker, in addition to a dial marking, bore the marking "Catena" on

The only evidence which could be reasonably claimed to fortify the inference that the watches were illegal imports because of the absence of a record of legal importation is Berger's testimony that the word "smuggled" was used in a conversation with the defendant prior to the transfer of the watches.

■■ The defendant would have this court reverse on the basis that the evidence of illegal importation, even when viewed in a light most favorable to the Government, as we must, e. g., United States v. Robbins, 340 F.2d 684, 687 (2 Cir. 1965) pointed as readily to innocence as to guilt. Although it is true that here a reasonable hypothesis that the watches may have been legally introduced into American commerce can be theorized from the facts, such an inference does not foreclose the jury from reaching the opposite conclusion. United States v. Ragland, 375 F.2d 471, 477 (2 Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); United States v. Aadal, 368 F.2d 962, 964 (2 Cir. 1966), cert. denied, 386 U.S. 970, 87 S.Ct. 1161, 18 L.Ed.2d 130 (1967); United States v. Botsch, 364 F.2d 542, 550 (2 Cir. 1966), cert. denied, 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810 (1967); United States v. Marchisio, 344 F.2d 653, 662 (2 Cir. 1965); United States v. Woodner, 317 F.2d 649, 651 (2 Cir.), cert. denied, 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963); United States v. Ploof, 311 F.2d 544, 546 (2 Cir. 1963); United States v. Tutino, 269 F.2d 488, 490 (2 Cir. 1959); United States v. Moia, 251 F.2d 255, 258 (2 Cir. 1958); see Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954). We do not agree with the contrary rule followed by the Fifth Circuit as stated in Battles v. United States, 388 F.2d 799, 801–802 & n. 3 (5 Cir. 1968) that, in order to sustain conviction, the inferences reasonably to be drawn from the evidence, when entirely circumstantial, must preclude every reasonable hypothesis other than guilt.

The would-be hypothesis that the defendant was not dealing in contraband involves the inference that inasmuch as dial names can be and often are changed by legitimate dealers, the watches introduced into evidence to prove defendant's guilt may have been so altered, and consequently, if so altered, would not have shown up in the Government's records of unsymboled legal imports or its records of unsymboled watches sold by the Government after forfeiture. Indeed, the prosecution made no effort to rebut Grunberger's testimony that the watch dial names had in fact been changed by Herstig and did not inquire of its expert witnesses whether the names on the watches in question were unaltered.

On the other hand, of the relatively small number of unsymboled watches which find their way legally into commerce as compared to those in commerce which have been illegally imported, there is a reasonable probability that the watches in question here were of the latter variety. The fact that Berger had dealt in smuggled watches, see note 2 *supra,* and the somewhat clandestine manner in which the watches were transferred fortifies the more reasonable hypothesis that the watches were illegal imports.

■■ We must point out, however, that where the Government's case involves close factual issues [7] and its proof

---

the movements. The Government's expert testified that no record could be found of "Catena" movements having been lawfully imported. Nevertheless, the jury acquitted the defendant on the count charging the illegal concealment of these watches, apparently because they had a reasonable doubt that Grunberger concealed them in the subway locker. Because Grunberger denied knowledge of these watch movements and because the

Government's witness Berger related he expected to find liquor, and not watches, there, the jury may have believed that if there really were watches in the locker someone other than Grunberger—perhaps Herstig—must have put them there.

7. Grunberger's story was inherently credible and dovetailed with the corroborating evidence the Customs officials were able to produce. Contradicted only by the

of an element of the crimes alleged leaves room for a reasonable inference inconsistent with guilt, we will scrutinize claimed error with particular care. Error which may be deemed relatively minor in other circumstances may reach prejudicial proportions in a close factual case such as this. Cf. United States v. Persico, 305 F.2d 534, 536 (2 Cir. 1962). Grunberger's primary defense was his claim that the 2000 watch movements were not his property or the property of Herstig, but, as pledged property being redeemed, they were being returned to their true owner, Kalman Berger, after the dial name "Leica" (admitted by Berger to be a trade name used by him) had been changed at Berger's request to "Cova," and that the $12,000 check was the repayment of the loan Berger owed to Herstig. Had the jury believed Grunberger's version of the transaction it would seem that he most likely would have been acquitted on all counts.[8]

Appellant next contends that he did not receive a fair and impartial trial because the jury must have realized that the trial judge gave the greater credence to Berger's account of the facts from the contrasting manner in which he examined Berger and appellant while each was testifying.

It is difficult for an appellate court to determine from a reading of words spoken at trial whether questions by the judge had the effect of unfairly disparaging the defense. We are not given the benefit of witnessing the juxtaposition of personalities which may help prevent reading too much into "the cold black and white of a printed record." United States v. Ah Kee Eng, 241 F.2d 157, 161 (2 Cir. 1957). As was said by Judge Moore, dissenting in United States v. Guglielmini, 384 F.2d 602, 608 (2 Cir. 1967):

> [E]very judge has his own individual manner of conducting a trial and, of necessity, must have great leeway in so doing. Even appellate decisions cannot reduce the judicial personality to a common colorless denominator.

We must be mindful, however, that a trial judge's responsibility to assist the jury in understanding the evidence by asking questions to clarify testimony must not be so zealously pursued as to give the jury the impression of partisanship or the impression that he believes one version of the evidence and disbelieves or doubts another. United States v. Guglielmini, *supra* at 605; United States v. Persico, 305 F.2d 534, 540 (2 Cir. 1962); United States v. De Sisto, 289 F.2d 833, 834–835 (2 Cir. 1961); United States v. Curcio, 279 F.2d 681, 682 (2 Cir.), cert. denied, 364 U.S. 824, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960); United States v. Brandt, 196 F.2d 653, 655–656 (2 Cir. 1952); see Quercia v. United States, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). It did not appear that counsel at Grunberger's trial were inexperienced triers or were unable to elicit testimony without confusing the jury. Yet while the defend-

---

testimony of Berger—whose compulsion accurately to relate the events in dispute was quite understandably not free from an ulterior motive—the jury was compelled to decide whose version was the more believable story. The defendant's claim of innocence rested on the jury's view of the witnesses' credibility.

8. After oral argument of this appeal and while the case was *sub judice* in our court, appellant moved the trial court to grant him a new trial on the ground that he possessed valuable newly discovered evidence. Appellant alleged in his motion that he had acquired sufficient evidence to prove that the 2000 watch movements, the ownership of which was in dispute at trial, were indeed watches belonging at all material times to Kalman Berger, and not to the defendant or to Herstig. The court below deferred ruling on appellant's motion until the appeal had been decided. Subsequently appellant moved this court to remand the case to the district court so that this motion for a new trial could be there accorded plenary consideration. Due to our disposition of the appeal, we need not consider appellant's motion to remand. If, after considering appellant's new representations, the Government chooses to retry him, the way is now open for appellant to introduce his newly discovered evidence into that trial.

ant was testifying on direct examination the trial transcript discloses that the court repeatedly interrupted counsel's line of questioning with questions of his own that were aimed at testing the plausibility of defendant's version of his transactions with Berger. In contrast, it would seem from our reading that when Berger was on the stand the judge refrained from probing the mechanics of the transaction and was far more patient and moderate with the witness while helping him to unfold his story. The court apparently viewed certain features of the defendant's account of his dealings with Berger and Herstig—as, for example, the issuance of the post-dated check to a fictitious payee—as unusual, and sought through repeated questioning of Grunberger to expand the defendant's testimony relative to it. During Berger's testimony, however, the judge did not become inquisitive when Berger's story seemed equally, or more, unusual. For instance, the court did not intervene when Berger testified he gave the defendant a post-dated check in exchange for contraband, or when Berger, who testified he vigorously protested to Grunberger that $12,000 was too high a price to pay for 2,000 watch movements, suddenly ceased to protest when offered a few bottles of liquor.

■ As a result of the court's varying style of interrogating the prosecution's prime witness and the defendant, the jury might have received the impression that the judge believed Berger's version of the facts to be the more plausible of the two versions. As has often been said, "The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.'" Quercia v. United States, *supra* at 470, 53 S.Ct. at 699. Moreover, instructions given in the charge to the jury that they are the sole judges of the credibility of the witnesses cannot remove the impression so created. United States v. De Sisto, *supra*, 289 F.2d at 835.

■ Other error was committed at trial—although it was not timely objected to—when the prosecutor told the jury in his summation:

"I don't know of a case where the evidence has been as strong as it has been in this case to establish the guilt of any defendant."

If the jury believed that the prosecutor was an experienced one and knew about a lot of cases, they were left with no alternative but to believe the Government's witness, Berger. The remark was not merely an averment of a personal belief in Grunberger's guilt based on the evidence adduced at Grunberger's trial; it was a statement of belief that the jury was expected to understand came from the prosecutor's personal knowledge of, and from the prosecutor's prior experience with, other defendants, and as such he was speaking as an expert based upon matter outside the record. That the remark was improper is beyond dispute. See Lawn v. United States, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Gradsky v. United States, 373 F.2d 706, 710 (5 Cir. 1967); United States v. Sawyer, 347 F. 2d 372, 373 (4 Cir. 1965); United States v. Johnson, 331 F.2d 281, 282 (2 Cir.), cert. denied, Pheribo v. United States, 379 U.S. 905, 85 S.Ct. 196, 13 L. Ed.2d 178 (1964); Thompson v. United States, 272 F.2d 919, 921 (5 Cir. 1959), cert. denied, 362 U.S. 940, 80 S.Ct. 805, 4 L.Ed.2d 769 (1960); Schmidt v. United States, 237 F.2d 542, 543 (8 Cir. 1956).

While it is true that failure to object to like remarks has sometimes constituted a waiver of the point, e. g., Leary v. United States, 383 F.2d 851, 865 (5 Cir. 1967), rev'd on other grounds, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (issue waived by failure to object); United States v. Aadal, 368 F.2d 962, 965 (2 Cir. 1966), cert. denied, 386 U.S. 970, 87 S.Ct. 1161, 18 L.Ed.2d 130 (1967) (not reversible error absent objection); compare United States v. Sawyer, *supra* at 373–374 (failure to object not waiver if defendant un-

fairly prejudiced by improper argument), it is understandable that a defense counsel may wish to avoid underscoring a prejudicial remark in the minds of the jury by drawing attention to it. Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 240, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Semensohn, 421 F.2d 1206 (2 Cir. 1970); Thompson v. United States, supra at 922.

■ The final point raised by appellant is that the court improperly charged the jury that a statement made by the defendant during a search of his home was an admission, and if the jury found it was voluntarily made they could consider it in weighing the defendant's guilt. A Customs agent testified that when the defendant was confronted with several watches and watch movements found under his bed, he said, "This is illegal." On the other hand, the defendant testified that he spoke those words to the Customs agents but that he posed the remark in the form of a question, "This is illegal?" [9] These watches found in the defendant's home were the subject of the count in the indictment that the court dismissed prior to submission of the five remaining counts to the jury. Appellant contends that even if the jury were to disbelieve the defend-

ant's claim that the utterance was not an admission, they should have been instructed to completely disregard anything said at that time because it related to an allegation of a crime that was not submitted to the jury. During a colloquy following instructions to the jury, the court refused to tell the jury to completely disregard the utterance, but was willing, if the defense so desired, to apprise the jury that there was a factual dispute as to whether the utterance was an admission or was merely a question as the defendant claimed. Prior to re-charging the jury, however, the defense withdrew its request with respect to the form of the utterance, and the trial judge let the matter rest. The jury was told that the undisputed evidence that the defendant spoke these words constituted an admission of guilt by him. But of course if the jury believed that the defendant was asking a question, the words spoken were not an admission of anything. The judge therefore usurped the function of the jury as a fact-finder and allowed his view, the prosecution view, of the sharply disputed purport of this evidence to be the only view the jury should consider. Although it can be said that the defense may have failed to protect against this error, we cannot ignore the totality of this and other improprieties when examining whether in this particular case, where the factual issues were close and the Government's case was not particularly strong, the defendant received an impartial trial.

Reversed and remanded.

9. Overlooking the defendant's testimony rebutting the Government's view that this concededly voluntary utterance was an admission, the court charged:

There is some evidence that Mr. Grunberger made a statement during a search by the agents at his home. Now, this is an out of court admission * * *.